[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12758
_____

D.C. Docket No. 1:18-cv-03093-CAP

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellant,

versus

HENCO HOLDING CORP.,
ALFREDO CACERES,
LUIS ALFREDO CACERES,
LUIS ANGEL CACERES,
individually and as beneficiary of the
Luis Angel Caceres Charitable Remainder Unitrust,
LUIS ANGEL CACERES CHARITABLE REMAINDER UNITRUST,

                                        Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(January 19, 2021)

Before ROSENBAUM, LAGOA, and ANDERSON, Circuit Judges.

LAGOA, Circuit Judge:

This appeal requires us to determine whether the government must separately assess a transferor's tax liabilities against a transferee under Internal Revenue Code ("I.R.C.") § 6901 in order to collect those tax liabilities from the transferee. The government appeals the district court's order dismissing its complaint against Alfredo Caceres, Luis Alfredo Caceres, Luis Angel Caceres, and the Luis Angel Caceres Charitable Remainder Unitrust (collectively, the "Caceres Defendants") on the basis that the government had not timely assessed tax liabilities against the Caceres Defendants as transferees of Henco Holding Corp. pursuant to § 6901. Because we are bound by the United States Supreme Court's decision in *Leighton v. United States*, 289 U.S. 506 (1933), and for the reasons stated below, we reverse the district court's order dismissing the complaint as to the Caceres Defendants and remand for further proceedings.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On June 27, 2018, the government filed suit against Henco to "reduce to judgment [Henco's] unpaid tax liabilities" and against the Caceres Defendants to receive money judgments for fraudulent transfers they received from Henco. At all

2

times relevant to the government's claims, Henco was organized in Georgia as a "C" corporation, and in 1996, the Caceres Defendants owned all of Henco's stock.[1]

As of December 1996, Henco's sole asset was its 50.5 percent interest in a subsidiary, Belca Foodservice Corporation.  Because Belca's stock had increased substantially in value since the time Henco acquired it, Henco considered selling its shares.  If Henco liquidated its Belca shares and directly distributed the proceeds to the Caceres Defendants, however, there would have been a capital gains tax on the liquidation and an additional tax on each distribution.  The Caceres Defendants were aware of these tax consequences and sought to avoid the dual taxation.  To do so, they came up with a plan, described by the government as "a sham sale of Henco's stock to an intermediary, Skandia Capital Group," which would use a "special purpose vehicle," referred to as UP Acquisitions, to purchase Henco's stock.

On January 31, 1997, Henco sold its Belca stock to an unrelated third party for approximately $37 million in cash.  Henco was left with no assets other than that cash from the sale plus cash from the concurrent repayment of debt from Belca to Henco.  The Belca stock sale triggered a capital gains tax liability of approximately $13 million against Henco, leaving Henco worth approximately $24 million.  Following the Belca stock sale, the Caceres Defendants and Skandia entered into an

---

[1] As alleged in the government's complaint, Henco is currently incorporated in Wyoming and was administratively dissolved in 2012.  Because this appeal comes to us on a motion to dismiss, our factual discussion is taken solely from the government's allegations in its complaint.

agreement where UP would acquire all of Henco's stock from the Caceres Defendants for $33,493,284. Thereafter, on or around April 4, 1997, Henco opened a bank account at Rabobank, "a Dutch bank that has provided financing in several intermediary transaction tax shelters." Two of the Caceres Defendants had signature authority over the Rabobank account. On April 9, 1997, Henco transferred $37,187,606.30—the cash from its sale of Belca stock as well as the concurrent repayment of debt from Belca to Henco—to the Rabobank account.

Then, on April 10, 1997, Skandia borrowed the purchase price of $33,493,284 from Rabobank via a promissory note, promising to repay that amount plus interest by May 9, 1997, and pledging the Henco stock it was purchasing to secure the loan. Skandia also promised to immediately declare a dividend from Henco in the amount of the loan plus $1 million and to use the dividend to purchase a certificate of deposit from Rabobank, ensuring Rabobank would get repaid. Skandia then used the loan to purchase the Henco stock, and that same day, Rabobank was instructed to distribute the proceeds (minus a negotiated holdback) to the Caceres Defendants according to their ownership interests. The Caceres Defendants gave up their positions as officers, employees, and directors of Henco, and, in their place, Dag Sundby, who controlled Skandia, became Henco's sole director, president, secretary, and treasurer. Sundby, in a separate transaction, declared the promised dividend to

4

purchase the certificate of deposit from Rabobank, which, upon its maturity, Skandia used to repay the loan from Rabobank.

Following these transactions, the Caceres Defendants received their payouts and gave up their interests in Henco. Thereafter, Henco, to "evade[] its responsibility for the capital gains taxes," engaged in additional transactions. On May 16, 1997, Henco's stock was sold to Squires, LLC, a limited liability company formed under the laws of the Isle of Man, for $870,537. A series of transactions involving European currency options with other Skandia subsidiaries acting as tax shelters then occurred. As alleged by the government, the Caceres Defendants' sale of their Henco stock to Skandia was merely a disguise allowing Skandia to serve as an "intermediary" entity for what was, in substance, a distribution of Henco's cash to the Caceres Defendants. As a result of these transactions, Henco became insolvent by April 10, 1997, as its liabilities were in excess of its assets. Henco subsequently reported an "artificial" $34,917,500 tax loss on its 1997 federal income tax return, completely offsetting the capital gain from the sale of Belca stock.

The Internal Revenue Service ("IRS") audited Henco's 1997 tax return, and Henco subsequently agreed to multiple extensions of the IRS's deadline for making assessments against Henco, extending the deadline to November 27, 2007. On June 13, 2007, the IRS issued a statutory notice of deficiency to Henco, disallowing the tax shelter losses used to offset Henco's capital gain on the sale of Belca stock.

Henco defaulted by failing to contest the notice of deficiency in a Tax Court petition, and on October 26, 2007, the IRS assessed taxes, as well as applicable penalties and interest, against Henco, which eventually totaled $56,356,718.77. The IRS gave notice to Henco of this assessment, but Henco failed to pay the amount of the assessed liabilities. Following Henco's failure to pay, the IRS issued a notice of intent to levy and a notice of federal tax lien, both of which informed Henco of its right to request a collection due process hearing. On April 11, 2008, Henco requested a collection due process hearing, and following those proceedings, the IRS sustained the levy and lien filings in an August 6, 2008, notice of determination. On September 5, 2008, Henco filed a Tax Court petition challenging the collection activity and underlying tax liabilities. The Tax Court entered an order sustaining the liabilities assessed against Henco, which, according to the government, estops Henco from challenging any of the assessments.

Several years later, the government filed its complaint against Henco and the Caceres Defendants in the district court. As to Henco, the government sought to reduce the tax liabilities assessed against Henco, plus further interest and statutory additions allowed by law, to a judgment. Henco did not answer the complaint or otherwise appear before the district court, and on May 21, 2019, the district court entered a default judgment against Henco for $60,777,269.36, i.e., the total amount

6

of unpaid tax, penalties, and interest.  The default judgment is not at issue in this appeal.

As to the Caceres Defendants, the government brought claims against them for fraudulent transfers in violation of Georgia's former fraudulent transfers statutes.[2] *See* Ga. Code Ann. §§ 18-2-21, 18-2-22 (1997).  The government alleged that (1) it became Henco's creditor when Henco sold its Belca stock and incurred capital gains tax liability; (2) the Rabobank loan and Henco stock sale to Skandia were "shams" and the stock sale was, in substance, a liquidating distribution to the Caceres Defendants; (3) Henco was insolvent on the date of the transfers; (4) Henco did not receive valuable consideration from the Caceres Defendants; (5) Henco made the transfers to the Caceres Defendants with the intention to delay or defraud its creditors; and (6) the Caceres Defendants knew the purpose of those transfers.  The government alternatively alleged that even if the Henco stock sale were not disregarded as a sham, the Caceres Defendants were still recipients of fraudulent transfers under Georgia law because Henco made a fraudulent transfer to Skandia, which in turn made fraudulent transfers to the Caceres Defendants.  Accordingly, the government sought the amounts transferred to each of the Caceres Defendants

---

[2] In 2002, Georgia amended its fraudulent transfer statutes to adopt the Uniform Fraudulent Transfers Act.

7

plus pre- and post-judgment interest. In its claims against the Caceres Defendants, the government specifically alleged that it was proceeding under I.R.C. § 6502(a).

The Caceres Defendants moved to dismiss the government's complaint. They argued that the applicable statute of limitations under Georgia law was four years and that the government's claims therefore were time-barred. The Caceres Defendants also argued that the government failed to state a claim against them, as applicable Georgia law at the time provided relief at law against only transferees and the government's complaint made clear that Henco, which owed the taxes, did not make a transfer to them. The Caceres Defendants asserted that the government had failed to bring an action against the actual transferees, instead bringing its action "against the former shareholders who sold their shares in Henco to an unrelated third-party buyer, prior to any distributions from debtor Henco." Additionally, they claimed that § 6502 did not extend the time for making an assessment against them for Henco's tax liabilities. Although the Caceres Defendants did not dispute that § 6502's ten-year limitation period for collection of an assessed tax applied to Henco, they argued that it was inapplicable to them because they were never assessed that tax liability by the IRS. The Caceres Defendants asserted that I.R.C. § 6901 exclusively governs claims against transferees and that the § 6901 limitation period in which an assessment can be made against a transferee is one year after the period of assessment for tax liabilities against the transferor. Because the tax

8

liabilities were assessed against Henco in October 2007, the Caceres Defendants claimed that the IRS would have normally been required to assess taxes against them no later than the end of October 2008. However, as Henco had contested the assessment on April 11, 2008, the Caceres Defendants conceded that the statute of limitations was tolled until the conclusion of those proceedings on October 19, 2011, giving the IRS until May 2012 to assess taxes against them. Because the IRS had not done so, the Caceres Defendants asserted that the claims should be dismissed.

The government opposed the Caceres Defendants' motion to dismiss. The government argued that it was not bound by Georgia's statute of limitations for fraudulent transfers and that it could proceed against the Caceres Defendants based on the assessment against Henco under § 6502(a) without separately assessing them as transferees under § 6901.

On May 14, 2019, the district court issued an order dismissing the government's complaint. The district court first determined that the government was not bound by Georgia's statute of limitations. Turning to the Caceres Defendants' argument that the government was required to separately assess them as transferees under § 6901, the district court interpreted § 6901(a), which provides that a transferee's tax liability "shall . . . be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred," to mean that the transferee's

9

liability is assessed and collected under the same rules that apply to the ordinary, pre-transfer tax liability of the transferor. While noting that § 6901 contained exceptions, the district court explained that the only relevant exception in § 6901(c)(1), which extends the limitations period for assessment of transferee tax liability by one year after the expiration of the period against the transferor, was inapplicable, as the government acknowledged "that the time for making a § 6901 assessment . . . ha[d] passed."

Turning to I.R.C. § 6501(a), which provides limitations on assessment and collection, the district court rejected the government's position that it could "collect unassessed taxes from the [Caceres Defendants] at any point within the time where it may collect the assessed taxes against Henco" under § 6501(a) because the government never assessed the Caceres Defendants as transferees and the period for when the tax liability "shall be assessed" had passed. As such, the district court found that the plain language of § 6501(a) did not permit the government to now collect the taxes from the Caceres Defendants. The district court also explained that its interpretation was supported by the legislative histories of the Revenue Act of 1926 and the Revenue Act of 1928. Reviewing the legislative histories, the district court determined that "Congress did not intend for an assessment against a taxpayer to extend an unassessed transferee's possible liability for ten years or more" and that

10

"[a]n assessment against the transferee must be made, so that 'the transferee may know that he is no longer liable to be proceeded against.'"

The district court also rejected the government's argument that, under *Hall v. United States*, 403 F.2d 344 (5th Cir. 1968), and *United States v. Galletti*, 541 U.S. 114 (2004), once the government assessed Henco, it was not required "to duplicate its efforts and reassess the same tax against" the Caceres Defendants. The district court distinguished *Hall* as an in rem action to set aside fraudulent transfers of property "ancillary to collecting a judgment against taxpayer-transferors." Unlike *Hall*, the district court explained that in this case the government was seeking to hold the Caceres Defendants personally liable under a transferee theory and was not proceeding in rem against specific property. As to the government's reliance on *Galletti*, the district court noted that in *Galletti* the entity was a general partnership, and that the Supreme Court held § 6501 does not require the IRS to make a separate assessment against persons secondarily liable for the tax debt. Unlike in *Galletti*, the district court noted that the tax code had a specific requirement for transferees to be separately assessed and that the Caceres Defendants were not "secondarily liable" for Henco's debts. Instead, the district court found the Supreme Court's decision in *United States v. Continental National Bank & Trust Co.*, 305 U.S. 398 (1939), to be persuasive. The district court read *Continental* as concluding that when the period of limitations for assessing transferees expires, a "suit in absence of assessment of

11

transferee liability" is barred.    Although *Continental* involved an unassessed transferee of an initial transferee, the district court found that principle similarly applied to an unassessed initial transferee.    The district court granted the Caceres Defendants' motion to dismiss.    This timely appeal ensued.

## II.    STANDARD OF REVIEW

We review *de novo* a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, accepting the complaint's factual allegations as true and construing them in the light most favorable to the plaintiff.  *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008).    Additionally, a Rule 12(b)(6) dismissal based on a statute of limitations is appropriate only where it is "'apparent from the face of the complaint' that the claim is time-barred."  *Brotherhood of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1194 (11th Cir. 2008) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005)).

## III.    ANALYSIS

On appeal, the government argues that the district court erred in dismissing its complaint against the Caceres Defendants.  The government asserts that it timely assessed tax liabilities against Henco under § 6502(a) and that it was not required to separately assess the Caceres Defendants as transferees under § 6901.  The Caceres

12

Defendants disagree, and alternatively argue that Georgia's statute of limitations for claims of fraudulent transfers should apply to bar the government's action against them. We first briefly address the Caceres Defendants' state statute of limitations argument before turning to whether § 6901 requires separate transferee assessment of a transferor's tax liabilities.

## A.    Whether the government is bound by the state statute of limitations

The Caceres Defendants argue that the government is bound by Georgia's statute of limitations for claims brought under Georgia's fraudulent transfer statutes, which they assert is a four-year limitations period.[3] This argument is without merit.

"It is well settled that the United States is not bound by state statutes of limitation . . . in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416 (1940). Indeed, "[w]hen the United States becomes entitled to a claim, acting in its governmental capacity and asserts its claim in that right, it cannot be deemed to have abdicated its governmental authority so as to become subject to a state statute putting a time limit upon enforcement." *Id.* at 417. For example, in *United States*

---

[3] The Caceres Defendants further argue that the government's claims against them are now extinguished under Georgia's version of the Uniform Fraudulent Transfers Act ("UFTA"). *See* Ga. Code Ann. § 18-2-79. To the extent that the Caceres Defendants argue that the government cannot proceed against them because UFTA repealed Georgia's former fraudulent transfer statutes, this argument is without merit. This Court has held that "as a matter of Georgia law . . . the UFTA did not retroactively repeal Ga. Code Ann. § 18-2-22, nor otherwise affect any claims based upon that statutory provision, where the underlying events occurred before the July 1, 2002[,] effective date of the UFTA." *Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1087 (11th Cir. 2004).

*v. Fernon*, 640 F.2d 609, 612 (5th Cir. Unit B Mar. 1981),[4] the Unit B panel of the former Fifth Circuit found that the government was not bound by Florida's statute of limitations where the government sought "to recover the value of the fraudulently transferred property in partial satisfaction of the outstanding tax deficiencies."

Similarly here, the government is not bound by Georgia's statute of limitations in pursuing its claims under Georgia law against the Caceres Defendants. We therefore affirm as to this issue.

B.    **Whether the government was required to separately assess Henco's tax liabilities against the Caceres Defendants as transferees**

Turning to the main issue in this case, the government argues that its claims against the Caceres Defendants are timely based on the government's timely assessment against Henco under § 6502. The government contends that it was not required to separately assess Henco's tax liabilities against the Caceres Defendants under § 6901 as transferees and that the district court erred in determining otherwise.

When construing statutory language, we begin "where all such inquiries must begin: with the language of the statute itself," giving "effect to the plain terms of the statute." *In re Valone*, 784 F.3d 1398, 1402 (11th Cir. 2015) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). Preliminarily, we note that the government has a "formidable arsenal of collection tools . . . to ensure the prompt

---

[4] Decisions issued by Unit B of the former Fifth Circuit are binding precedent in the Eleventh Circuit. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

14

and certain enforcement of the tax laws." *United States v. Rodgers*, 461 U.S. 677, 683 (1983).

Three sections of the Internal Revenue Code are relevant here—§§ 6501, 6502, and 6901. Section 6501—titled "Limitations on assessment and collection"—provides that, as a general rule, "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed . . . , and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period." I.R.C. § 6501(a). Section 6502—titled "Collection after assessment"—provides that where an assessment of tax was properly made within the applicable limitation period, the tax may be collected by a court proceeding if that proceeding begins "within 10 years after the assessment of the tax." I.R.C. § 6502(a)(1). And § 6901—titled "Transferred assets"—provides that liabilities for income taxes for a transferee "shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." I.R.C. § 6901(a). Section 6901(c)(1) further provides that, "[i]n the case of the liability of an initial transferee," the period of limitations is "within 1 year after the expiration of the period of limitation for assessment against the transferor."

The Caceres Defendants assert that the plain language of § 6901, when read together with § 6501, required the government to separately assess Henco's tax liabilities against them as transferees. Specifically, they point to the term "shall" in § 6901, which they assert directs mandatory action. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." (quoting *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016))); *United States v. Peters*, 783 F.3d 1361, 1364 (11th Cir. 2015) (explaining that the term "shall" used in a statute indicates a command and "creates an obligation not subject to judicial discretion"); *see also Shall*, *Black's Law Dictionary* (11th ed. 2019) (defining shall as "[h]as a duty to; more broadly is required to"). They also claim that the IRS's own regulations and Internal Revenue Manual require transferee assessment under § 6901, which the IRS routinely follows. Because the time period for transferee assessment under § 6901—i.e., within a year after the expiration of the time period for assessing Henco, the transferor—has passed, the Caceres Defendants argue that the government's action against them cannot proceed.

The Caceres Defendants' and the district court's interpretation of the relevant code provisions, however, is foreclosed by the Supreme Court's decision in *Leighton v. United States*, 289 U.S. 506 (1933). In *Leighton*, a California corporation sold all its assets and distributed the sale proceeds to its shareholders,

16

leaving nothing to satisfy its outstanding tax liabilities. *Id.* at 506–07. The IRS assessed taxes against the corporation, which neither contested nor paid the assessment. *Id.* at 507. The IRS then proceeded in equity against the shareholders "to account for corporate property in order that it may be applied toward payment of taxes due by the company," although the IRS had not separately assessed those shareholders for the corporation's tax liability. *Id.* The district court determined that "the distributed assets constituted a trust fund" and that each shareholder should account for the amount received from the corporation. *Id.* The Ninth Circuit affirmed. *Id.*

In analyzing the case, the Supreme Court began by noting that prior to the enactment of the Revenue Act of 1926, the government, in an equity proceeding, could "recover from distributees of corporate assets, without assessment against them, the value of what they received in order to discharge taxes assessed against the corporation." *Id.* at 507–08. The Court explained that "this right remained unless taken away by the specific words or clear intendment of the 1926 enactment." *Id.* at 508. The *Leighton* shareholders argued that Congress had, in fact, done so, as section 280 of the Revenue Act of 1926—the predecessor statute to § 6901, *see* Revenue Act of 1926, ch. 27, § 280, 44 Stat. 9, 61—"read in connection with" sections 274(a) and 278 of that Act showed that Congress intended to require the government to separately assess them as transferees before it could sue them for

17

restitution. *See Leighton*, 289 U.S. at 508–09. The shareholders further argued that section 280 was the "sole remedy available" to the government. *Id.* at 509.

The Supreme Court, however, rejected those arguments. While noting that "[t]he meaning of the statute is not free from uncertainty," the Court explained that the shareholders' argument had been presented to courts "several times" and that, in those cases, "the right of the United States to proceed against transferees by suit since the act of 1926 ha[d] been definitely recognized." *See id.* As such, based on "the established rule of strict construction, the views expressed in the cases cited, [and] the possible conflict with other statutory provisions," the Court held that the suit was properly brought against the shareholders without a separate assessment against them as transferees. *Id. Leighton* has never been overruled, and section 280 of the 1926 Act contains language nearly identical to the language of § 6901. *See* Revenue Act of 1926 § 280 ("The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this title . . . . The period of limitation for assessment of any such liability of a transferee . . . shall be . . . [w]ithin one year after the expiration of the period of limitation for assessment against the taxpayer . . . ."); *see also United States v. Geniviva*, 16 F.3d 522, 524 n.2 (3d Cir. 1994) (examining

18

section 280 and § 6901 and concluding that there were "no differences in language that would undermine the holding in *Leighton*").

The government contends that the Supreme Court in *Leighton* determined that separate assessment of transferees under § 6901 is not required in order to collect tax liabilities assessed against a transferor-taxpayer, pointing to subsequent decisions interpreting *Leighton*. For example, in *United States v. Russell*, 461 F.2d 605, 605–06 (10th Cir.), *cert. denied*, 409 U.S. 1012 (1972), a district court dismissed the government's action against a transferee for unpaid federal estate taxes that were previously assessed against the estate because the transferee was not assessed within the time period under § 6901. The Tenth Circuit reversed, holding that "the collection procedures contained in § 6901 are *not exclusive and mandatory*, but are *cumulative and alternative* to the other methods of tax collection recognized and used prior to the enactment of § 6901 and its statutory predecessors," based on "the teaching of *Leighton*." *Id.* at 606 (emphasis added). While recognizing *Leighton* did not have "extended comment" on the issue, the Tenth Circuit found that the government was able to "maintain an action in law against a fiduciary without following the collection procedures provided in § 6901." *Id.* at 607. The court determined that the fact that *Leighton* involved a suit in equity while *Russell* involved a suit in law was not a significant distinction. *See id.* at 608. The court also rejected the argument that the Supreme Court was not "fully apprised . . . as to

19

the legislative history of § 6901," as "[s]uch argument should be made to the Supreme Court." *Id.*

The Tenth Circuit has continued to apply *Leighton* and *Russell*. *See United States v. Johnson*, 920 F.3d 639, 646 (10th Cir. 2019) (applying *Russell* in the estate tax context); *United States v. Holmes*, 727 F.3d 1230, 1231–34 (10th Cir. 2013) (applying *Leighton* and *Russell* where the government sought unpaid taxes assessed against a defunct corporate entity under § 6502(a) from its sole shareholder who was not separately assessed under § 6901). Additionally, several other circuits have reached a similar conclusion as the Tenth Circuit. *See, e.g.*, *Geniviva*, 16 F.3d at 524 (applying the principle articulated by *Leighton* and *Russell* that "a failure by the [g]overnment to personally assess the shareholders of a defunct corporation did not bar an action to impose transferee liability against them"); *Culligan Water Conditioning of Tri-Cities, Inc. v. United States*, 567 F.2d 867, 870 (9th Cir. 1978) ("Section 6901 provides the [IRS] the power to use against a transferee the same summary collection procedures it may use against a transferor or any other delinquent taxpayer. But that section is not mandatory, as appellants suggest; rather, it adds to other methods available for collection."); *Payne v. United States*, 247 F.2d 481, 484–85 (8th Cir. 1957) (determining that a predecessor to § 6901 did not "preclude the bringing . . . of a plenary suit against [an unassessed] transferee to subject property received by him from a taxpayer, to the payment of income taxes

20

owned by the latter, under the trust fund doctrine"); *United States v. Motsinger*, 123 F.2d 585, 588 (4th Cir. 1941) (describing section 280 of the 1926 Act as "an alternative summary method of collection by notice to the . . . transferee" that "did not create a new obligation, but merely provided a new remedy for enforcing an existing obligation").

The government further asserts that its position is supported by *Hall v. United States*, 403 F.2d 344 (5th Cir. 1968),[5] and *United States v. Galletti*, 541 U.S. 114 (2004). In *Hall*, the government assessed unpaid income taxes against a married couple. 403 F.2d at 345. Following the husband's death, the government instituted an action to reduce the tax liabilities to a judgment and eventually amended its complaint "to allege certain fraudulent conveyances of the [couple's] property to appellant-transferees" that had not been separately assessed against the transferees by the government. *Id.* On appeal, the former Fifth Circuit addressed "whether the government may proceed, in an effort to collect its judgment against taxpayers, to set aside conveyances by taxpayers allegedly made to transferees to defraud creditors where no assessment was made against the transferees" within the time period of § 6502. *Id.* at 345. The court ultimately held that the § 6502 limitations period was inapplicable to the case, as the transferees were not being pursued under

---

[5] This Court adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

21

the transferee statute nor under an implied or resulting trust theory as shareholders or successors. *Id.* at 346. Rather, the court described the case as an "ancillary proceeding to collect a judgment against others," i.e., an "in rem action to set aside fraudulent conveyances ancillary to collecting a judgment against taxpayer-transferors." *See id.* at 345–46. In reaching its holding, however, the former Fifth Circuit analyzed the Supreme Court's decision in *United States v. Updike*, 281 U.S. 489 (1930), noting that, in *Updike*, the government was barred from pursuing an action against unassessed shareholders for a corporation's unpaid, assessed tax liability based on the expiration of the limitations period in § 6502, *not* the limitations period in § 6901. *See Hall*, 403 F.2d at 346. The former Fifth Circuit explained that, in the cases applying the *Updike* principle, the rationale was "that the suit was a proceeding against a transferee on a trust fund theory within the contemplation of § 6502 . . . to collect taxes due" and it did not matter "whether the suit be under the transferee statutes . . . or alternatively, as a direct suit without assessment." *Id.* at 347.

In *Galletti*, the Supreme Court held that the government was not required to "make separate assessments of a single tax debt against persons or entities secondarily liable" for that debt, i.e., "liability that is derived from the original or primary liability," in order for § 6502's statute of limitations to apply to those persons or entities. 541 U.S. at 121–22 & n.4. The taxpayer in *Galletti* was a

partnership formed under California law, with the partners "only secondarily liable for the tax debts of the partnership." *Id.* at 116. The Court determined that it was "clear that the term 'assessment' refers to little more than the calculation or recording of a tax liability" based on its numerous uses throughout the Code. *Id.* at 122. The Court explained that, in most cases, the IRS accepts taxpayers' self-assessments, but where the IRS rejects that self-assessment, it can calculate and record the proper amount of liability. *Id.* While the assessment of a tax triggered certain consequences—for example, permitting the government to employ administrative enforcement methods to collect that tax and extending the time period for collection—"the fact that the act of assessment has consequences does not change the function of the assessment: to calculate and record a tax liability." *Id.* at 122–23. As such, the Court determined that it was clear that "it is *the tax* that is assessed, not the taxpayer." *Id.* at 123 (emphasis in original). The Court also addressed *Updike*, noting that it held the limitations period resulting from a proper assessment in a predecessor to § 6502 "governs 'the extent of time for the enforcement of the tax liability,'" i.e., that "the statute of limitations attached to the debt as a whole." *Id.* (quoting *Updike*, 281 U.S. at 495). The Court further noted that the *Updike* Court "held that the same limitations period applied in a suit to collect the tax from the corporation as in a suit to collect the tax from the derivatively liable transferee." *Id.* Thus, "[o]nce a tax has been properly assessed, nothing in the Code requires the IRS

23

to duplicate its efforts by separately assessing the same tax against individuals or entities who are not the actual taxpayers but are, by reason of state law, liable for payment of the taxpayer's debt." *Id.*

We are bound by the principles articulated in *Leighton*, *Hall*, and *Galletti*. The Caceres Defendants, however, make several arguments as to why *Leighton* and its progeny, as well as *Hall* and *Galletti*, should not apply here. We find none of these arguments availing.

First, the Caceres Defendants contend that the legislative history of § 6901 and its predecessors in the Revenue Act of 1926 and the Revenue Act of 1928 support its interpretation that separate transferee assessment is required, claiming that Congress rejected an attempt to make section 280 cumulative, rather than "exclusive," during the drafting of the 1928 Act. They note that *Leighton* was decided under the 1926 Act, which was subsequently amended. There are several problems with the Caceres Defendants' argument. First, even if they are correct that the legislative history of § 6901 and its predecessors conflicts with *Leighton*, under our system of vertical precedent, we are bound to apply *Leighton* until it is overruled, receded from, or in some other way altered by the Supreme Court. *See Gonzalez v. Sec'y, Fla. Dep't of Corr.*, 629 F.3d 1219, 1223 (11th Cir. 2011) ("[W]e are bound by decisions of the Supreme Court."); *United States v. Thomas*, 242 F.3d 1028, 1035 (11th Cir. 2001) (explaining that this Court is bound to follow Supreme Court

24

precedent "unless and until the Supreme Court itself overrules that decision"); *see also Russell*, 461 F.2d at 608 ("We are not at liberty to go behind the *Leighton* rule."). Second, even if we were not so bound, fundamental principles of statutory analysis undercut the Caceres Defendants' argument. The law is the statutory text that has passed the constitutional requirements of enactment and presentment. As discussed above, the language of § 6901 and its predecessors has remained nearly identical throughout several revisions to the Internal Revenue Code since the 1926 Act, including the provision's use of the term "shall." And "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)); *accord Phillip C. ex rel. A.C. v. Jefferson Cnty. Bd. of Educ.*, 701 F.3d 691, 696–97 (11th Cir. 2012). Since adopting the statutory language in the 1926 Act, Congress has not modified § 6901 (or its predecessors) to clearly indicate that the provision is the sole mechanism for assessing a transferor's tax liabilities against transferees, nor has Congress otherwise demonstrated any intent to abrogate *Leighton* and its progeny. And, as the government notes, the *Leighton* shareholders themselves brought the legislative history of the 1926 Act to the Supreme Court's attention. *See* Brief for the United States, *Leighton*, 289 U.S. 506, No. 735, 1933 WL 31562 (May 9, 1933).

25

Next, the Caceres Defendants argue that we should limit the application of *Leighton* and *Galletti* to individuals or entities that are primarily or secondarily liable for the transferor's debts and liabilities. They assert that, under California law in effect at the time *Leighton* was decided, shareholders of a California corporation were "individually and personally liable for such proportion of all [the corporation's] debts and liabilities . . . during the time he was a stockholder." *See* Cal. Const. of 1897, art. XII, § 3 (repealed Nov. 4, 1930). Similarly, the Caceres Defendants note that the partners in *Galletti* were secondarily liable for the California partnership's debts. *See Galletti*, 541 U.S. at 116. Because shareholders of a Georgia corporation, such as Henco, are generally not liable under Georgia law for that corporation's liabilities, *see* Ga. Code Ann. § 14-2-622, the Caceres Defendants contend that *Leighton* and *Galletti* should not apply. As the Caceres Defendants concede, however, nowhere in *Leighton* did the Supreme Court hold that either the transferor's corporate form or state law governing shareholder liability was relevant to its analysis. Indeed, the two cases relied on by the Supreme Court in *Leighton* for its recognition that, prior to the Revenue Act of 1926, the government could proceed in equity against distributees of corporate assets, without assessment against them, did not involve a California corporation. *See Phillips v. Comm'r of Internal Revenue*, 283 U.S. 589 (1931) (involving a Pennsylvania corporation); *Updike*, 281 U.S. 489 (involving a Nebraska corporation); *see also Leighton*, 289 U.S. at 507–

08. We thus decline to read *Leighton*'s holding in the manner urged by the Caceres Defendants. And, in *Galletti*, the Supreme Court described its definition of secondary liability in this context as "liability that is derived from the original or primary liability." 541 U.S. at 122 n.4. Based on the allegations of the government's complaint, *see Mills*, 511 F.3d at 1303, it appears that the Caceres Defendants would be secondarily liable for Henco's tax liabilities based on fraudulent transfers they received from Henco. Moreover, as the Court explained in *Galletti*, "it is the tax that is assessed, not the taxpayer," 541 U.S. at 123, and it is undisputed that the government timely assessed the tax liabilities against Henco.

The Caceres Defendants also contend that *United States v. Continental National Bank & Trust Co.*, 305 U.S. 398 (1939), which the district court relied upon in dismissing the government's claims, supports their position. In *Continental*, a testator was the principal shareholder of an Illinois corporation that was dissolved, with its assets being converted to cash and securities and transferred to the testator. *Id.* at 399–400. The government later assessed a tax deficiency against the corporation and informed the testator that there was a proposed assessment against him for that deficiency as transferee of the corporation's assets. *Id.* at 400. The testator filed a petition for redetermination, but subsequently died several years later. *Id.* The testator's will was admitted to probate, and the government made a "jeopardy assessment" against the testator and submitted a claim with the estate's

27

administrator. *Id.* The administrator, however, did not pay the claim and, instead, transferred most of the estate to a trustee. *See id.* at 400–01. The government then sought to collect the tax liabilities assessed against the testator from the trustee and the will's beneficiaries. *Id.* at 401.

The Supreme Court first explained that the government's action could not be based upon the assessment of the taxpayer, i.e., the dissolved corporation, as "[t]he time for such a suit . . . expired long before the commencement of [the] suit." *See id.* at 403. Rather, the Court determined that the suit was "against transferees under the will of a transferee of the property of the taxpayer[,] . . . based on the jeopardy assessment made against testator." *Id.* The Court rejected the government's argument that it had six years after the jeopardy assessment of the testator—the original transferee—to bring a suit against the trustee and beneficiaries—the subsequent transferees. *Id.* The Court noted that no assessment was made against any of the subsequent transferees, who were not "transferees[s] of the property of the taxpayer [corporation]" but instead were "testamentary transferees of the estate of testator." *Id.* at 404. Determining that sections 278(d) and 280—predecessors to §§ 6502(a) and 6901, respectively—were "not broad enough to impose on defendants any liability on account of the assessment against the testator," the Court found that "suit on assessment against the taxpayer, or suit in absence of assessment

28

of transferee liability, was by the applicable statutes of limitations barred long before this suit was brought." *Id.* at 404–05.

We find the Caceres Defendants' and the district court's interpretation of *Continental* flawed for several reasons. As an initial matter, we note that *Continental* did not address *Leighton* nor is there any indication in *Continental* that the Supreme Court intended to overrule *Leighton*. Moreover, in *Continental*, the Supreme Court found that the government's action was outside both the limitations period of collecting an assessment against the transferor taxpayer (the dissolved corporation) under section 278(d) *and* the limitation period for separately assessing the transferees of the taxpayer's transferee (the testator) under section 280. *See id.* at 403. As the Tenth Circuit explained in *Holmes* when rejecting a similar reading of *Continental*, the Court "clearly recognized that a suit against a transferee would have been sustainable—based on the assessment against the transferor—if it had been brought within the time permitted for suit against the transferor." 727 F.3d at 1235 n.4. Here, by contrast, the government has sued the Caceres Defendants within the ten-year period permitted for suit against Henco.

The Caceres Defendants also argue that our decision in *L.V. Castle Investment Group, Inc. v. C.I.R.*, 465 F.3d 1243 (11th Cir. 2006), supports their position. In *L.V. Castle*, the IRS sent a dissolved Illinois corporation a notice of deficiency disallowing certain deductions for a taxable year. *See id.* at 1244. The dissolved

corporation and its sole shareholder filed a petition in the Tax Court to redetermine the corporation's deficiency, although the petition was filed after the expiration of the statutory time period for the corporation to wind up its business. *See id.* at 1244. This Court held that the dissolved corporation lacked the capacity to contest its tax liability, despite its inability to defend itself, and that the shareholder's attempt to litigate on behalf of the corporation was premature because "the Tax Court's jurisdiction is limited to petitions filed by the party named in the notice of deficiency." *Id.* at 1247–48. This Court explained that "Congress has provided a transferee of a defunct corporation with the ability to petition the Tax Court to challenge the Commissioner's determination that it is liable as a transferee for an income tax deficiency of the defunct corporation" under § 6901, but that the transferee "must wait until the Commissioner has made a determination of transferee liability and issued a notice to it." *Id.* at 1248. This Court also noted that the IRS had "yet to file a notice of transferee liability, which it must do before it can move against the corporation's assets if they have already been transferred from the dissolved corporation." *Id.* at 1247.

However, this Court in *L.V. Castle* was not asked to decide the issue on appeal in the instant case, i.e., whether the government was required to separately assess a transferee under § 6901 or, rather, could proceed against the transferee based on the assessment against the transferor under § 6502. Rather, this Court addressed the

30

question of which party could file a petition in the Tax Court challenging the government's determination of tax deficiencies. *See L.V. Castle*, 465 F.3d at 1245–48. Because the government had not put the defunct corporation's shareholders on notice that it intended to treat the shareholder as a liable transferee, the shareholder's petition in the Tax Court was premature. Furthermore, *L.V. Castle* does not address *Leighton*, which is binding precedent upon us. Thus, to the extent that *L.V. Castle* could be construed as this Court stating that the government is required to separately assess a transferor's tax liabilities against a transferee under § 6901, it is dicta contrary to the Supreme Court's decision in *Leighton*. *See CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1338 (11th Cir. 2017) ("The holding of an appellate court constitutes the precedent, as a point necessarily decided. Dicta do not: they are merely remarks made in the course of a decision but not essential to the reasoning behind that decision." (quoting Bryan A. Garner et al., *The Law of Judicial Precedent* 44 (2016))).

Here, accepting the facts in the government's complaint as true, as we must at this stage of the proceedings, *see Mills*, 511 F.3d at 1303, the government timely assessed tax liabilities against Henco on October 26, 2007, beginning the ten-year time period for collection of those assessed taxes under § 6502. Because Henco contested the assessment in a collection due process proceeding, the statute of

31

limitations was tolled until the conclusion of that proceeding on October 19, 2011. Thus, the government's action, which was filed on June 27, 2018, was well within § 6502's ten-year limitations period. Additionally, as alleged by the government, the Caceres Defendants are liable for Henco's tax liabilities based on fraudulent transfers they received from Henco in violation of Georgia's former fraudulent transfer statutes in order to avoid the capital gains taxes incurred by Henco in its sale of the Belca stock. Under *Leighton*, once the government timely assessed the tax liabilities against Henco, it was not required to separately assess the Caceres Defendants as transferees under § 6901, as that provision is simply an additional tool for the government to assess and collect from a transferee the tax liabilities owed by a transferor. Thus, the government can proceed against the Caceres Defendants as transferees under § 6502.

While we hold that the government was not required to separately assess the Caceres Defendants for Henco's assessed tax liabilities under § 6901, we take no position on the veracity of the government's factual allegations in its complaint or the merits of its claims against the Caceres Defendants. On remand, as the government concedes in its reply brief, the Caceres Defendants can challenge their own liability under Georgia law and the government's allegation that they are estopped from challenging Henco's tax liabilities. We also take no position on whether the assessment of tax liabilities against Henco is sufficient to trigger liability

32

against the Caceres Defendants, as former shareholders of Henco, for interest and penalties without separate notice and demand to them. *Cf. Galletti*, 541 U.S. at 119 n.1.

## IV.   CONCLUSION

For the reasons stated herein, we reverse the district court's order dismissing the government's claims against the Caceres Defendants on the basis that the government was required to separately assess them as transferees under § 6901, and we remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**