[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11128

_____

CAROLYN NOLEN,
on behalf of herself and all others similarly situated,
WINDY KELLEY,
on behalf of herself and all others similarly situated,
CARA KELLEY,
on behalf of herself and all others similarly situated,
PAULA LITTON,
on behalf of herself and all others similarly situated,

Plaintiffs-Appellants,

*versus*

FAIRSHARE VACATION OWNERS ASSOCIATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-00330-PGB-EJK

_____

Before LUCK, LAGOA, and TJOFLAT, Circuit Judges.

LAGOA, Circuit Judge:

This appeal is about the alleged mismanagement of a trust associated with the timeshare program run by Wyndham Vacation Resorts, Inc. ("WVR"). Carolyn Nolen, Windy Kelley, Cara Kelley, and Paula Litton (collectively, "Appellants") are members of that timeshare program and beneficiaries of the associated trust—the Fairshare Vacation Plan Use Management Trust (the "Trust")—who claim that Fairshare Vacation Owners Association ("Fairshare") violated its fiduciary duties and the Arkansas Trust Code in various ways as the Trustee of the Trust.

On March 18, 2021, the district court dismissed counts 2 to 4 of the first amended complaint for failing to adequately allege a violation of Arkansas Code Ann. § 28-73-802 and count 5 for failing to adequately allege a violation of Arkansas Code Ann. § 28-73-1003. As part of that dismissal order, the district court left counts 1 and 6 intact and allowed Appellants to "file a second amended complaint consistent with the directives of [the] [o]rder."

Appellants subsequently filed their second amended complaint on April 1, 2021. The district court, however, viewed the

second amended complaint as introducing entirely new theories of liability and thereby exceeding the limited leave to amend that had been granted for the purpose of correcting the problems identified with counts 2 to 5 of the first amended complaint. After raising this concern during a Federal Rule of Civil Procedure 16 conference and giving Appellants a chance to respond, the district court struck the second amended complaint in its entirety for exceeding the scope of the leave to amend. In doing so, the District Court reinstated the first amended complaint as the operative pleading, with only counts 1 and 6 remaining. Ultimately, the district court granted summary judgment in favor of Appellee on both of those remaining claims.

On appeal, Appellants contend that the district court erred at each step: first by dismissing counts 2 to 5 of the first amended complaint; then by striking the second amended complaint; and, most recently, by granting summary judgment on counts 1 and 6 of the reinstated first amended complaint. Following careful review, and with the benefit of oral argument, we affirm all of the challenged rulings.

## I.    BACKGROUND

WVR, formerly known as Fairfield Resorts, Inc., develops "resort communities" and sells interests in those communities as part of a timeshare program. Consumers who purchase a timeshare interest from WVR become members of the timeshare program and beneficiaries of the Trust, an Arkansas trust established by WVR. Broadly speaking, the main purpose of the Trust

is to enable members of the timeshare program to "use and exchange [their] Use Rights" in WVR resorts. Members do this by assigning their use rights in their home resort to the Trust, to be enjoyed by other members, which in exchange allows them to book stays at other resorts.

The Trust is governed by Arkansas law and the Second Amended Restated Fairshare Vacation Plan Use Management Trust Agreement (the "Trust Agreement"). The Trust Agreement establishes Fairshare as the Trustee and imposes on Fairshare the duties to physically maintain the relevant properties, prepare accounting, prepare federal tax returns, and maintain adequate insurance. But the Trust Agreement also contemplates that Fairshare will delegate the preparation of accounting and "any or all of its [other] duties" to the Plan Manager. To that end, the Trust Agreement establishes WVR as the "initial Plan Manager" and incorporates the "Management Agreement," a separate agreement between Fairshare and WVR.

As a beneficiary of the Trust, each member is required to pay an Owners' Association Fee and a Program Fee. The Owners' Association Fee is determined by each owners' association and is meant to cover the applicable "recreation, maintenance[,] and reserve fees and assessments and real estate taxes." The Program Fee, on the other hand, is determined by the Trustee (with input from the Plan Manager) and is meant to cover "the cost of the operation and administration of the Plan," including "the operation and administration of the Trust." The Management Agreement

entitles WVR, as the Plan Manager, to "monthly compensation equal to one-twelfth (1/12th) of five percent (5%) of the Program Fees." And despite also being considered a member, WVR is generally exempt from having to pay an Owners' Association Fee and a Program Fee.

On February 25, 2020, Appellants[1] filed their initial complaint, naming WVR, Fairshare, and RCI, LLC,[2] as defendants. Appellants are consumers who purchased timeshares from WVR and accordingly became beneficiaries of the Trust. Generally speaking, the initial complaint accused WVR of running an unlawful securitization and re-financing scheme; Fairshare of improperly retaining excess Trust Funds and negligently operating the Trust; WVR and Fairshare of being affiliated entities and engaging in self-dealing through their interactions with one another; and all three defendants of violating the Arkansas Trust Code and conspiring to improperly profit from the timeshare exchange program.

On May 26, 2020, the defendants moved to dismiss the initial complaint—on the bases that it failed to state a claim and constituted a shotgun pleading—and moved to stay discovery pending resolution of the motion to dismiss. Within a day, the district court denied the stay request.

---

[1] Carolyn Nolen, one of Appellants, is also known as Carolyn Miller Jones, and some documents in the record refer to her as such.

[2] According to the Initial Complaint, RCI is an entity that helped operate the timeshare exchange program.

While the motion to dismiss was being briefed, the parties filed a joint case management report on June 10, 2020. That report proposed, among other things, a deadline of June 15, 2020, for any motions to add a party or amend a pleading. Three weeks later, the district court entered a case management and scheduling order in which it adopted that proposed (and already expired) deadline. The case management and scheduling order also adopted December 31, 2020, as the class certification discovery deadline; February 12, 2021, as the class certification motion deadline; and June 1, 2021, as the merits discovery deadline. The order also advised the parties that "the pendency of a dispositive motion, such as a motion to dismiss or for summary judgment, does not stay the deadline for completion of discovery"; that motions for an extension are disfavored; and the district court may impose sanctions, including "the striking of pleadings," on any party who fails to comply with the order.

On September 10, 2020, the district court granted the motion to dismiss because the initial complaint constituted a shotgun pleading. The district court noted that the initial complaint failed to identify the facts relevant to each claim and failed to separate into different counts the various claims asserted against each defendant. In doing so, the district court gave Appellants until September 24, 2020, to "file an Amended Complaint consistent with the directives of [the] Order," and later extended that deadline to October 8, 2020.

Then, on October 8, 2020, Appellants filed the first amended complaint. Unlike the initial complaint, the first amended complaint brought claims against only Fairshare, not WVR or RCI. Those claims consisted of the following: declaratory judgment (count 1); violation of Arkansas Code Ann. § 28-73-802 by entering into the Management Agreement with WVR (count 2); violation of section 28-73-802 by self-dealing through financing agreements (count 3); violation of section 28-73-802 by self-dealing through securitization (count 4); violation of Arkansas Code Ann. § 28-73-1003 by profiting from the use of Trust property (count 5); and breach of fiduciary duty (count 6).

On November 5, 2020, Fairshare moved to dismiss the first amended complaint, once again arguing that Appellants had failed to state any claim. In light of that dispositive motion, Appellants moved unopposed for an extension of the February 12, 2021, class certification deadline to avoid having to brief "theories that may not survive" the resolution of the motion to dismiss. The district court promptly denied that request. Appellants thus filed their motion for class certification on February 12, 2021, while Fairshare's motion to dismiss remained pending.

About a month later, the district court granted in part and denied in part the motion to dismiss the first amended complaint. The district court dismissed without prejudice counts 2 to 5 and allowed counts 1 and 6 to proceed. As to counts 2 to 4 (the section 28-73-802 claims), the district court held that the first amended

complaint failed to adequately allege that subsection (b) of the statute was met. As to count 5 (the section 28-73-1003 claim), the district court held that the complaint's allegations that Fairshare charged excessive fees and improperly retained Trust funds were conclusory and inadequate. The district court ended its order with the following instruction:

> On or before **April 1, 2021**, [Appellants] may file a second amended complaint consistent with the directives of this Order, if they believe they can do so in accordance with Rule 11. Failure to timely file a second amended complaint will result in dismissal of this entire action **with prejudice**.

(Emphasis in original). The district court contemporaneously denied as moot the motion for class certification by separate order.

On April 1, 2021, Appellants filed their second amended complaint, once again naming Fairshare as the sole defendant. The second amended complaint included the following claims: (1) declaratory judgment; (2) violation of Arkansas Code Ann. § 28-73-801 by failing to hold a vote on the fund balance; (3) violation of Arkansas Code Ann. § 28-73-804 by failing to hold a vote on the fund balance; (4) violation of section 28-73-801 by paying marketing expenses to WVR; (5) section 28-73-802 by paying marketing expenses to WVR; (6) violation of Arkansas Code Ann. § 28-73-805 by paying marketing expenses to WVR; (7) violation of section 28-73-804 by failing to investigate the reasonableness of WVR's management fees; (8) violation of section 28-73-805 by failing to investigate the reasonableness of WVR's management fees; and (9)

breach of fiduciary duty.  All of these claims were based on, among other things, new allegations that Fairshare: (1) failed to perform due diligence related to the selection of WVR as Plan Manager; (2) used Trust funds to reimburse WVR for its marketing expenses in violation of the Management Agreement[3]; and (3) failed to hold a vote on what to do with the excess Trust funds in violation of its own bylaws.[4]

Along with the second amended complaint, Appellants filed a motion for a Rule 16 conference and an extension of the case management deadlines.[5]  The next day, Fairshare indicated that it agreed that a Rule 16 conference would be beneficial.  The district court promptly responded by scheduling a telephonic hearing for April 8, 2021.

At that hearing, the district court brought up for discussion the propriety of the second amended complaint.  The court began by clarifying the scope of the leave to amend:

---

[3] Section 6.2(b)(iii) of the Management Agreement provides that the Plan Manager "shall be responsible for and pay from [its] own funds all . . . marketing costs regarding sales of Memberships."  This contrasts with section 6.2(a), which provides that the Trust shall reimburse the Plan Manager for certain other costs.

[4] Section 2.2 of Fairshare's Second Amended and Restated Bylaws states that, for any year which results in a balance surplus, the Board of the Trust shall cause the Members to vote on whether the surplus should be refunded to the Members or applied to next year's costs.  Appellants contend that those bylaws are incorporated into the Trust Agreement by reference.

[5] Rule 16 governs pretrial conferences and scheduling.

> In the [Order Granting in Part and Denying in Part the Motion to Dismiss the First Amended Complaint], there is language at the end that states that by April 1st, 2021, [Appellants have] leave to re-file their complaint consistent with the Court's directives, if they can do so without violating Rule 11 and then stating, of course, if there's a failure to re-submit a complaint then the case will be dismissed with prejudice, leaving the option to [Appellants] whether or not to re-plead. And so the purpose of the motion to dismiss, of course, was to narrow the issues before the Court, if possible, and then the [Order Granting in Part and Denying in Part the Motion to Dismiss the First Amended Complaint] identified with particularity what was wrong with the [first] amended complaint.

The district court then contrasted the factual theories alleged in the first amended complaint with those alleged in the second amended complaint and expressed the following concern:

> This change in theories . . . is driving the need for new disclosure of class experts, presumably new depositions of corporate representatives, new disclosures or updated disclosures of the merit expert reports to incorporate the new material and the extended deadlines for discovery and so forth, and the extended deadline for the trial.
>
> Let me tell you my concern with all this.
>
> The case management and scheduling order makes it pretty clear that the original complaint is obviously

> the operative document and a plaintiff can modify it, that is, amend it once without leave of court by June 15th of 2020. And that didn't happen, of course. The amended complaint occurred October 8th of 2020, as a result of a motion to dismiss.
>
> The second amended complaint was driven by the more recent motion to dismiss [in] March of this year. The deadline for raising new theories and new causes of action had long ago expired. The Eleventh Circuit caselaw is clear on this point.

The district court then cited some cases, including an unpublished case from this Court, *The Cincinnati Insurance Co. v. Cochran*, No. 05-16867, 2006 WL 4495335, at *3 (11th Cir. Dec. 27, 2006), that affirmed a district court's decision to strike a counterclaim that exceeded the scope of the limited leave to amend. The district court then continued as follows:

> [M]y concern is that by not following the directives of the [Order Granting in Part and Denying in Part the Motion to Dismiss the First Amended Complaint], which was limited to fixing the problems with the [first] amended complaint, instead of doing that, a whole new case is started 14 months after we began this journey. And the real question becomes why that occurred and what to do about it.
>
> The proper procedural mechanism is to strike the [second] amended complaint . . . and leave us with whatever is left of the [first] amended complaint to proceed as opposed to re-setting the clock.

At that point, the district court gave Appellants a chance to respond. Appellants explained that, in drafting the second amended complaint, they "were attempting to address the deficiencies that the [c]ourt pointed out in its [Order Granting in Part and Denying in Part the Motion to Dismiss the First Amended Complaint]." Appellants also argued that they had simply added "facts," rather than any new theories. Fairshare, on the other hand, agreed with the district court's concern and noted that it had flagged the issue of new, unpled theories in its response to the motion for class certification. After both sides finished presenting argument, the district court took the matter under advisement.

The next day, the district court entered an order striking the second amended complaint. The district court stated that its order granting leave to amend the first amended complaint was for the sole purpose of "fixing the deficiencies" of counts 2 to 5 and concluded that, by introducing new theories of liability, the second amended complaint exceeded the scope of the leave to amend. For that reason, and to ensure the orderly progression of the case, the district court struck the second amended complaint in its entirety and reinstated counts 1 and 6 of the first amended complaint. The court also granted Appellants an extension of time through April 22, 2021, to file an amended motion for class certification, but warned that they "may not advance new unpled theories of their case" in any such motion.

On April 22, 2021, as contemplated, Appellants filed their amended motion for class certification. The district court ultimately granted that motion about three months later.

In the meantime, on July 1, 2021, Fairshare moved for summary judgment on Appellants' remaining claims, i.e., counts 1 and 6 of the first amended complaint. After full briefing,[6] the district court granted the motion and entered summary judgment in Fairshare's favor on March 10, 2022. In so ruling, the district court determined that no reasonable jury could find that Fairshare breached its fiduciary duty by entering into the Management Agreement with WVR; exempting WVR from paying the Program Fees; failing to return the surplus trust balance; or charging excessive program fees. As for the other theories of liability, Appellants had waived the theories regarding the financing and securitization of loans, and the district court expressly "refuse[d] to entertain evidence related to" Appellants' unpled theories of the case, i.e., the second amended complaint's theories of liability related to due diligence, WVR's marketing expenses, and the bylaws' voting procedure for excess funds.

---

[6] The summary judgment record includes, among other things, the Trust Agreement; the Management Agreement; a Joint Stipulation of Agreed Material Facts; the testimony of Jodi Rogers, a Vice President of Club Accounting for Wyndham Vacation Ownership Inc.; the testimony of Appellants Carolyn Nolen, Paula Litton, Windy Kelley, and Cara Kelley; the Appellants' signed transaction documents; and the Kelleys' Responses to Appellee's Request for Admissions.

Appellants timely appealed.

## II.    STANDARDS OF REVIEW

"We review *de novo* a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, accepting the complaint's factual allegations as true and construing them in the light most favorable to the plaintiff." *United States v. Henco Holding Corp.*, 985 F.3d 1290, 1296 (11th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As relevant, "[w]e also review *de novo* a district court's determination and application of state law in a diversity case." *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1132 n.11 (11th Cir. 2010).

We review a district court's exercise of inherent authority to strike a pleading for abuse of discretion. *State Exch. Bank v. Hartline*, 693 F.2d 1350, 1352 (11th Cir. 1982).

We review *de novo* a district court's grant of summary judgment. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). Summary judgment is proper when the evidence, viewed in a light most favorable to the non-moving party, "presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Id.* (quoting *Caldwell v. Warden*, 748 F.3d 1090, 1098 (11th Cir. 2014)).

## III.    ANALYSIS

Appellants challenge three of the district court's rulings: (1) the dismissal of counts 2 to 5 of the first amended complaint; (2) the decision to strike the second amended complaint; and (3) the summary judgment ruling in favor of Fairshare on counts 1 and 6 of the reinstated first amended complaint. We address those rulings in chronological order.[7]

## A. The Order Granting Fairshare's Motion to Dismiss Counts 2 to 5 of the First Amended Complaint

The first ruling on appeal is the district court's dismissal of counts 2 to 5 of the first amended complaint. We begin with the Arkansas Code Ann. § 28-73-802 claims (counts 2 to 4), and then turn to the Arkansas Code Ann. § 28-73-1003 claim (count 5).

### 1. *The Section 28-73-802 Claims (Counts 2 to 4)*

Counts 2 to 4 of the first amended complaint are claims that Fairshare violated section 28-73-802 (hereinafter, "section 802") through its dealings with WVR and management of the Trust. Section 802 governs the duty of loyalty owed by trustees and reads, in pertinent part, as follows:

> (a) A trustee shall administer the trust solely in the interests of the beneficiaries.
>
> (b) Subject to the rights of persons dealing with or assisting the trustee as provided in § 28-73-1012, a sale,

---

[7] We note that on appeal no party has raised any issue regarding the district court's class certification order. We therefore do not address that order.

encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction unless:

（1) the transaction was authorized by the terms of the trust;

（2) the transaction was approved by a court;

（3) the beneficiary did not commence a judicial proceeding within the time allowed by § 28-73-1005;

（4) the beneficiary consented to the trustee's conduct, ratified the transaction, or released the trustee in compliance with § 28-73-1009; or

（5) the transaction involves a contract entered into or claim acquired by the trustee before the person became or contemplated becoming trustee.

(c) A sale, encumbrance, or other transaction involving the investment or management of trust property is presumed to be affected by a conflict between personal and fiduciary interests if it is entered into by the trustee with:

（1) the trustee's spouse;

（2) the trustee's descendants, siblings, parents, or their spouses;

（3) an agent or attorney of the trustee; or

(4) a corporation or other person or enterprise in which the trustee, or a person who owns a significant interest in the trustee, has an interest that might affect the trustee's best judgment.

Ark. Code Ann. § 28-73-802(a)–(c).[8]

The district court held that counts 2 to 4 fail to state a claim under section 802 because they contain no allegations that the conditions set out in subsections 802(b)(1) to (b)(5) are met. In the district court's view, subsection 802(b) is the subsection that provides the applicable remedy in this case—i.e., the transactions at issue are potentially "voidable" by an affected beneficiary—and so, to state a claim, it is necessary to allege that subsection 802(b) is satisfied. Thus, because counts 2 to 4 make no mention of subsection 802(b)'s conditions, the court dismissed those counts without prejudice. In so ruling, the district court rejected the premise that subsection 802(c) provides its own remedy.

---

[8] Subsections 802(d) and (e) pertain to transactions that do not concern Trust property. Ark. Code Ann. § 28-73-802(d)–(e). Subsection 802(f) pertains to investments in securities. *Id.* § 28-73-802(f). Subsection 802(g) pertains to voting shares of stock or exercising similar powers of control. *Id.* § 28-73-802(g). Subsection 802(h) lists a series of transactions that are not "preclude[d]" by section 28-73-802 "if fair to the beneficiaries." *Id.* § 28-73-802(h). Subsection 802(i) provides that a court may appoint a special fiduciary. *Id.* § 28-73-802(i). And subsection 802(j) clarifies that subsections 802(b) through (e) "apply only to irrevocable trusts created on or after September 1, 2005, and to revocable trusts which become irrevocable on or after September 1, 2005." *Id.* § 28-73-802(j).

Appellants assert that the district court misunderstood section 802 and counts 2 to 4 because "[v]oiding the conflicted transaction is an available remedy under both subsections" 802(b) and (c) and thus counts 2 to 4 properly stated claims under the latter subsection. Appellants claim that this understanding of subsection 802(c)—i.e., as providing a standalone remedy apart from subsection 802(b)—is supported by the Uniform Law Comment, which discusses the different presumptions established by subsections 802(b) and (c). *See* Ark. Code Ann. § 28-73-802 cmt. Appellants also challenge the significance of subsection 802(b) by arguing that, even when a transaction has been authorized or ratified under subsection 802(b), it may still be unlawful under the common law. Appellants assert that a trustee cannot, for instance, eliminate the duty of loyalty through contract. None of these arguments, however, warrants reversal.

As a matter of statutory interpretation, Appellants are mistaken that subsection 802(c) provides a remedy separate from subsection 802(b). Under Arkansas law, which applies here, we "construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language; if the language of the statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion to resort to rules of statutory interpretation." *State v. Ledwell*, 526 S.W. 3d 1, 4 (Ark. 2017). And, plainly read, subsections 802(b) and (c) operate as follows. Subsection 802(b) describes the kinds of transactions that are voidable, including transactions that are "otherwise affected by a conflict," and then recognizes specific exceptions. Subsection 802(c), on the

other hand, identifies certain transactions that are "presumed to be affected by a conflict." *See* Ark. Code Ann. § 28-73-802(b)–(c). In other words, subsection 802(b) establishes a remedy for certain categories of transactions, and subsection 802(c) helps clarify one of those categories. *See id.* To the extent that Appellants purport to rely on the Uniform Law Comment to support a different interpretation of section 802, we emphasize that the actual text of section 802 is what controls. We also note, however, that nothing in the Comment indicates that subsection 802(c) provides a standalone remedy. *See id.* § 28-73-802 cmt. For these reasons, Appellants' attempt to frame counts 2 to 4 as claims for relief under subsection 802(c)—and not subsection 802(b)—is unavailing.

As for Appellants' contention that a transaction can potentially be authorized or ratified under subsection 802(b) but nevertheless unlawful, their point is not relevant here. The suggestion is that the selection of WVR as Plan Manager was unlawful, despite being contemplated by the Trust Agreement.[9] But the Trust Agreement does not purport to eliminate Fairshare's duty of loyalty to the Trust, and the first amended complaint does not allege that it does. Thus, Appellants' argument on this point is academic and does not salvage counts 2 to 4.

The district court's interpretation of section 802 accords with the plain text of the statute. Accordingly, the district court did

---

[9] The Trust Agreement states, in no uncertain terms, that "[t]he initial Plan Manager shall be [WVR], its successors or assigns."

not err in dismissing counts 2 to 4 without prejudice for failing to allege that subsection 802(b) is met.

### 2. *The Section 28-73-1003 Claim (Count 5)*

Count 5 of the first amended complaint is brought under a different section of the Arkansas Trust Code: section 28-73-1003 (hereinafter, "section 1003"). Section 1003 governs "[d]amages in absence of breach" and provides:

> (a) A trustee is accountable to an affected beneficiary for any profit made by the trustee arising from the administration of the trust, even absent a breach of trust.

> (b) Absent a breach of trust, a trustee is not liable to a beneficiary for a loss or depreciation in the value of trust property or for not having made a profit.

Ark. Code Ann. § 28-73-1003. Count 5, therefore, is a claim that Fairshare made a profit from the administration of the Trust and is accountable to the beneficiaries.

Count 5 alleges that Fairshare has continually "increase[d] the amount of fees and revenues it collects from [Appellants] and the class" despite "accumulating a positive trust fund balance through [those] excess fees and revenues." Relatedly, count 5 incorporates an allegation that "the Program Fee greatly exceeds the amount necessary to cover the cost of the operation and administration of the Trust" and "results in substantial profits to [Fairshare]." Count 5 also alleges that Fairshare "currently [holds]"

the surplus balance "for its own use" and has not shared it with or credited it to Appellants and the class.

The district court held that the allegations mentioned above are insufficient to state a claim under section 1003 and dismissed count 5. As a preliminary matter, the district court noted that "a 'positive trust fund balance' by itself does not amount to profit for [Fairshare]." More fundamentally, the court recognized count 5's core allegations of wrongdoing—i.e., that Fairshare charged excessive fees and then held the surplus balance exclusively for its own use—as conclusory and "fact-free."

Appellants insist on appeal that count 5's allegations are sufficient to state a claim, but we find their arguments on this point lack merit. Appellants highlight certain financial statements in the summary judgment record, which confirm the existence of a surplus Trust balance, and assert that "profit," as used in section 1003, refers to any excess of revenue over expenses. The cited financial statements, however, are not proper to consider at this stage. *See Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) ("A court is generally limited to reviewing what is within the four corners of the complaint on a motion to dismiss."). Moreover, as the district court pointed out, the existence of a surplus trust balance is not, by itself, probative of any wrongdoing. As for Appellants' emphasis of the meaning of the term "profit," that discussion misses the mark entirely. Although section 1003 certainly uses "profit" in the ordinary sense of the word, i.e., meaning the excess of revenue over expenses, it specifically refers to "any profit *made*

*by the trustee.*"  *See* Ark. Code § 28-73-1003(a) (emphasis added). This surrounding language indicates that section 1003 comes into play only when the *trustee* makes a profit—not simply when the *trust* makes a profit.  And, here, as the district court noted, count 5 offers at best conclusory allegations that Fairshare itself made a profit.

Accordingly, the district court did not err in dismissing count 5 of the first amended complaint.

## B.  The Order Striking the Second Amended Complaint

We now address the district court's decision to strike the second amended complaint.  As discussed above, at a Rule 16 conference, after Appellants had filed the second amended complaint, the district court expressed its concern that the new pleading exceeded the scope of the leave to amend that had been granted.  After this hearing, the district court struck the second amended complaint in its entirety and reinstated counts 1 and 6 of the first amended complaint.

Appellants now argue that the district court erred in its treatment of the second amended complaint, but we disagree.  "[T]he power to strike a pleading[] is inherent in a trial court's authority to enforce its orders and ensure prompt disposition of legal actions."  *Hartline*, 693 F.2d at 1352.  In this case, the district court reasonably interpreted the order in which it granted leave to amend as permitting repleading for the exclusive purpose of correcting counts 2 to 5 of the first amended complaint.  *See Cave v. Singletary*, 84 F.3d 1350, 1354 (11th Cir. 1996) ("[A] district court's

22-11128            Opinion of the Court            23

interpretation of its own order is properly accorded deference on appeal when its interpretation is reasonable.").

Accepting that interpretation of the leave to amend, we do not find any error in the district court's determination that the second amended complaint, as a whole, exceeds the scope of the leave to amend. In addition to seven entirely new statutory claims, the second amended complaint also introduces new factual theories pertaining to Fairshare's alleged failure to perform due diligence, payment of WVR's marketing expenses, and failure to hold a vote as required under the bylaws. And, critically, those new theories are incorporated into every count. Thus, not one count of the second amended complaint is consistent with the district court's understanding of the leave to amend.[10]

---

[10] In their reply brief, Appellants claim that they "were not given *any* opportunity to respond to the district court's concerns regarding the [second amended complaint]." (Emphasis in original). This is patently untrue. At the hearing on April 8, 2021, the district court explained its concerns about the second amended complaint and invited Appellants to respond, which they did. *See* Doc. 79 at 9. And when the district court subsequently indicated that it would be taking the matter under advisement, Appellants notably failed to request an opportunity to supplement their oral argument with written briefing. *See id.* at 17–18.

Relatedly, to the extent that Appellants claim that they were given insufficient notice of the decision to strike, we disagree. The concern about the second amended complaint's introduction of new theories of liability was first raised by Fairshare on March 15, 2021, in the response to the motion for class certification, over three weeks before the April 8, 2021, hearing and the district court's ultimate ruling. *See* Doc. 66 at 23–25. Moreover, the original scheduling order warned the parties that a noncompliant pleading might be stricken.

For these reasons, we affirm the district court's decision to strike the second amended complaint.

### C.  The Order Granting Fairshare's Motion for Summary Judgment on Counts 1 and 6 of the First Amended Complaint

We last turn to the district court's grant of summary judgment in favor of Fairshare on counts 1 and 6 of the reinstated first amended complaint.  As discussed, count 1 was a claim for declaratory judgment, and count 6 was a claim for breach of fiduciary duty.  Thus, both claims turned on the same question: whether Fairshare, as Trustee, breached its fiduciary duty to Appellants.

The district court ultimately determined that no reasonable jury could conclude that Fairshare committed such a breach.  In doing so, the district court considered the theories and evidence that Fairshare breached its fiduciary duty by entering into the Management Agreement with WVR; exempting WVR from the Program Fees; accumulating and retaining a surplus Trust fund balance; and charging members excessive Program Fees.  However, in accordance with its decision to strike the second amended complaint, the district court refused to consider the theories and evidence that Fairshare violated its fiduciary duty by failing to perform

---

*See* Doc. 40 at 16.  On this record, we conclude that Appellants had adequate notice of the decision to strike the second amended complaint.

due diligence, reimbursing WVR for marketing expenses, and failing to hold a vote as required under the bylaws.[11]

The crux of Appellants' argument on appeal is that the summary judgment ruling "is inextricably infected with the errors of the [Order Granting Fairshare's Motion to Dismiss Counts 2–5 of the First Amended Complaint]" and the order striking the second amended complaint. In other words, Appellants maintain that the district court erred by dismissing the other counts before summary judgment and also contend that it erred in its summary judgment analysis by refusing to consider evidence tied to the theories alleged in the second amended complaint. But for the reasons discussed, we find no error in the district court's decisions to dismiss counts 2 to 5 of the first amended complaint, strike the second amended complaint, and refuse to consider Appellants' new theories of liability. Seeing as all of Appellants' objections to the summary judgment ruling simply rehash those antecedent issues, Appellants have not presented a persuasive basis to reverse the summary judgment ruling.

On review, we find the district court's comprehensive summary judgment order to be well-reasoned and correct. We therefore affirm.

## IV.    CONCLUSION

---

[11] Appellants abandoned the theories that Fairshare breached its fiduciary duty by financing, re-financing, servicing, and securitizing loans.

26                    Opinion of the Court                    22-11128

For these reasons, we affirm all three of the district court's orders on appeal.

**AFFIRMED.**

22-11128 TJOFLAT, J., Concurring and Dissenting in part    1

TJOFLAT, Circuit Judge, Concurring in part and Dissenting in part:

I agree with my colleagues that the plaintiffs' claims were meritless. I concur in their affirmance of the District Court's dismissal of counts two through five of the first amended complaint and the District Court's striking of the second amended complaint. I respectfully dissent from my colleagues' affirmance of the District Court's grant of summary judgment on counts one and six of the first amended complaint. I would have vacated the District Court's opinion and remanded the matter to the District Court with instructions to dismiss those claims under Federal Rule of Civil Procedure 19.

To fully understand the conflicts—and the Rule 19 and 23 issues—in this case, it is necessary to introduce the major players:

| | |
|---|---|
| Wyndham Vacation Resorts ("Wyndham") | Developer of the resort properties; sold use rights in condominium properties to buyers; serves as Plan Manager of the Wyndham exchange program through its Management Agreement with the Association as Trustee. |
| Wyndham Destinations | Parent company of Wyndham Vacation Resorts; owns numerous other subsidiaries that similarly develop resorts; in total owns hundreds of resorts and tens of thousands of condominium units. |
| The Wyndham exchange program | Program that allows Wyndham timeshare owners to essentially trade their use rights with other Wyndham |

2          TJOFLAT, J., Concurring and Dissenting in part   22-11128

|  |  |
|---|---|
|  | owners and travel to Wyndham Destinations resorts other than their home resort; the exchange program is operated by Wyndham as the Plan Manager, pursuant to a Management Agreement with the Association as Trustee. |
| The FairShare Trust (the "Trust") | To participate in the Wyndham exchange program, buyers must assign their use rights to the Trust, which is managed by the Trustee—the Association. |
| The FairShare Association (the "Association" or the "Trustee") | Each owner who assigns their use rights to the Trust becomes a member of the Arkansas non-profit corporation the FairShare Association. The Association serves as Trustee of the Trust and is made up of the thousands of Wyndham owners who participate in the Wyndham exchange program through the Trust. The complaints allege that the Association Board is related to Wyndham because the board members are Wyndham employees. |
| The Plan Manager | Facilitates and operates the Wyndham exchange program under the Management Agreement with the Trustee; Wyndham serves as Plan Manager in addition to developing properties. |
| The Program Fund | Each member of the Association pays a yearly program fee into this fund, which pays the Trustee for operating the exchange program; the Trustee estimates |

22-11128 TJOFLAT, J., Concurring and Dissenting in part          3

how much money the program needs to operate in the coming year; and excess funds are either returned to the members or credited to the amount they would owe the next year.  Wyndham, as Plan Manager, is paid for the expenses it incurs in operating the exchange program from the Program Fund.  It also receives 5% of the total amount collected in a given year as a fee for operating the exchange program.

Plaintiffs' argument is that the Association charged the members excessive fees and that both the Association and Wyndham—as Trustee and Plan Manager, respectively—profited from the arrangement.  The complaints—all three of them—frame the relief sought as compensatory damages, punitive damages, and other relief as the District Court saw fit to provide.  But squeezed down, the allegations in the complaints show that the plaintiffs *really* seek: a declaratory judgment that the Association violated its fiduciary duties to the Association's members, removal of the Association as Trustee, an accounting from the Association for excess funds, and an injunction ordering that the Board of the Association cancel the Management Agreement (which would remove Wyndham as Plan Manager).

The named plaintiffs sought and received class certification as a damages class action under Federal Rule of Civil Procedure 23(b)(3).  The District Court certified the following class:

4          Tjoflat, J., Concurring and Dissenting in part  22-11128

> All persons and entities who are citizens of the United States of America and who on or after March 14, 2008 [the date the most current Trust Agreement became effective]: (1) purchased a timeshare with a Property Interest (or the Use Rights therein) subject to Fairshare Vacation Plan Use Management Trust or (2) purchased (including upgrading or refinancing) a Property Interest (or the Use Rights therein) previously subject to the Fairshare Vacation Plan Use Management Trust.[1]

But this case is not a damages class action. Even though the plaintiffs framed the relief they sought as damages, the true relief they sought—the relief that would actually solve their perceived problems going forward—is injunctive in nature. Even the monetary relief that is sought would be the result of injunctive relief. That is, the plaintiffs need an order for an accounting to return the allegedly excessive fees to the members.

In their motion for class certification, the plaintiffs argued that they were not seeking wholesale changes to the Wyndham timeshare system. But both in their complaint and before this Court, that is exactly what they sought. The complaint sought a court order removing the Association as the Trustee. And at oral argument, plaintiffs' counsel described the relief they sought as an

---

[1] This class includes anyone who joined the Wyndham exchange program and subjected their Use Rights to the Trust Agreement since March 2008. It therefore includes members who have since sold their Use Rights and are no longer members of the Association.

22-11128 Tjoflat, J., Concurring and Dissenting in part        5

order requiring the Trustee to return the excessive fees.  If this case could have been certified as a class action, then it should have been under either Rule 23(b)(1)(B) or (b)(2).

Rule 23(b)(1) and (2) are "mandatory class actions," meaning that class members are not typically afforded the option of "opting out."  This is because the relief granted to the class will impact them regardless of whether they are in the class.  In a Rule 23(b)(1)(B) action:

> prosecuting separate actions by or against individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1)(B).  In fact, "actions charging 'a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class' of beneficiaries, requiring an accounting or similar procedure to 'restore the subject of the trust,'" is a quintessential example of a Rule 23(b)(1)(B) action.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833–34, 119 S. Ct. 2295, 2308–09 (1999) (quoting Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment).

Similarly, in a Rule 23(b)(2) action, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P.

6              TJOFLAT, J., Concurring and Dissenting in part   22-11128

23(b)(2).  Rule 23(b)(2) applies "only when a single injunction or declaratory judgment would provide relief to *each* member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360, 131 S. Ct. 2541, 2557 (2011) (emphasis added).

Here, an order removing the Trustee would be "dispositive of the interests of the other members" who do not want changes to the program—but those members' views are not represented. Likewise, the inter-group conflict between those members who would change the program versus those who benefit from the status quo means that certification under Rule 23(b)(2) is inappropriate: "The very nature of a (b)(2) class is that it is homogenous without any conflicting interests between the members of the class." *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983) (quoting *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 256 (3d Cir. 1975)).

Ultimately, the District Court should not have even reached the question of which "type" of Rule 23(b) class action was appropriate.  This case could not have been certified under *any* provision of Rule 23(b) because the class does not meet the prerequisites of Rule 23(a).  This is especially important given that the more appropriate subsections of Rule 23(b) would have been the non-opt-out classes, where "Rule 23(a)'s insistence that the class be adequately represented by a litigant with claims typical of the class takes on special resonance."  2 William Rubenstein, *Newberg and Rubenstein on Class Actions* § 4.27 (6th ed. 2023).  The class here meets neither criteria.

22-11128 TJOFLAT, J., Concurring and Dissenting in part          7

Rule 23(a)(3) requires that "the claims . . . of the representative parties are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). In this case, though, the District Court certified a class of everyone who has been a member of the Association at any point since March 2008. The class is made up of current members and former members. It is made up of those who favor—and arguably benefit from—the current structure, as well as those who would dismantle it. What a "typical" interest is depends on what type of class member you are. Current class members who do not like the way the system currently works have vastly different interests than those current members who benefit from the current system. All the current members' interests vary wildly from former members because the current members are on the hook for any judgment against the Trustee—according to the Trust Agreement, any judgment against the Trustee is paid out of the Program Fund, which the current members fund each year. Given that there is no "typical" interest, the named plaintiffs also do not "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Nor could a single class counsel "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). There is no "class" interest.[2]

---

[2] It is worth noting that, in moving for class certification, plaintiffs' counsel made representations under Rule 11 that: (1) the class met Rule 23(a)'s typicality and adequacy prerequisites; (2) in addition to being certifiable under Rule 23(b)(3), the class could be certified under Rule 23(b)(2); and (3) counsel could adequately represent the class in the action under Rule 23(g)(4). My analysis suggests that, in making those representations, plaintiffs' counsel violated Rule 11.

8          TJOFLAT, J., Concurring and Dissenting in part  22-11128

This class could not be certified under Rule 23 at all, which means the cases—if they could be brought—would need to be brought individually.  But this leads to problems under Federal Rule of Civil Procedure 19, which protects the rights of absent parties by requiring a district court—if feasible—to join the absent parties who have interests in the case so that they can defend their interests.  In light of the interests Rule 19 protects, courts—including this Court—are responsible for applying it *sua sponte*.  As the Supreme Court explained, "[w]hen necessary . . . a court of appeals should, on its own initiative, take steps to protect the absent party, who of course had no opportunity to plead and prove his interest below."  *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 111, 88 S. Ct. 733, 738–39 (1968).

Rule 19(a)(1) provides, in pertinent part:

A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may [] as a practical matter impair or impede the person's ability to protect the interest.

22-11128 TJOFLAT, J., Concurring and Dissenting in part        9

Fed. R. Civ. P. 19(a)(1). The Rule goes on to say that if a required party has not been joined, "the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff." Fed. R. Civ. P. 19(a)(2).

If the plaintiffs who wished to remove the Association as the Trustee and Wyndham as the Plan Manager were to sue in an individual action, the Association members who prefer the current structure of the organization would undoubtedly be impaired or impeded from protecting their interests if they were not joined as a party. As such, the District Court should have, if feasible, joined them as defendants to the action so that their views were represented and they had a chance to protect their interests.

If a district court cannot feasibly join those parties, it must dismiss the case unless it can proceed in equity and good conscience. Fed. R. Civ. P. 19(b). In determining whether it should proceed, a district court considers:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
> > (A) protective provisions in the judgment;
> >
> > (B) shaping the relief; or
> >
> > (C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.* Those factors "are 'not intended to exclude other considerations'; 'pragmatic considerations' play a key role in our determination." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1344 (11th Cir. 2011) (quoting Fed. R. Civ. P. 19 advisory committee's note to 1966 amendment).

In conducting Rule 19(b)'s equitable analysis, we have emphasized the breadth of the relief sought and the availability of an alternative forum. *See Tick v. Cohen*, 787 F.2d 1490, 1495 (11th Cir. 1986) (per curiam). The broader the relief sought, the more difficult it is "to envision any conceivable way to fashion a meaningful judgment which will not affect the absent beneficiaries['] interests." *Id.* Relatedly, we emphasized that "any judgment favorable to the [plaintiffs] which [was] rendered in the absence of the trust beneficiaries will necessarily be inadequate." *Id.* We also emphasized that "the Florida courts [were] the superior forum for disposition of [the] action[] because it involve[d] questions of Florida trust law." *Id.*

In this case, the Rule 19(b) factors weigh in favor of dismissal. The first two factors that weigh powerfully in favor of dismissal are the availability of alternative remedies and the impossibility of narrowly shaping relief. The plaintiffs' complaint demanded

22-11128 TJOFLAT, J., Concurring and Dissenting in part      11

broad relief that would effectively dismantle the Wyndham exchange program. Removal of the Trustee and removal of Wyndham as Plan Manager would substantially alter the program's operations. There is no way to issue orders compelling the removal and replacement of the FairShare Association as Trustee or Wyndham as the Plan Manager without affecting the interests of all program members. That is, there is no way to narrowly craft the relief to give some class members what they want without impeding other class members' interests.

If a majority of the Association's members desire these outcomes, however, there is a simple—and obvious—solution. The members can easily achieve their goals in a forum that is readily available to all members: the annual Association meeting, where each member has a vote. If plaintiffs are correct that all members think the Plan Manager agreement harms them, 75% can all vote to remove Wyndham at an Association meeting under the Trust Agreement and the FairShare Association's Bylaws. If plaintiffs are also correct that all program members favor redistribution of the excess program funds, then a majority of them can vote to do that too. The Bylaws also provide that program members may vote by proxy, meaning the members can send someone to the annual meeting to vote for these measures on their behalf—they do not need all of the members to show up individually to achieve their desired outcome.

If the reason the members have not had a chance to vote on the excess money is that the Board violated the Bylaws by refusing

12          TJOFLAT, J., Concurring and Dissenting in part  22-11128

to hold the vote, as plaintiffs allege, the members could sue the Board members in a "direct action" for an *in personam* order enjoining them to follow the bylaws and hold the vote. *See Hames v. Cravens*, 966 S.W.2d 244, 247 (Ark. 1998) ("[A] shareholder may sue individually in an action to enforce that shareholder's voting rights, to compel the payment of dividends, or to protect minority shareholders."). This, too, would more easily and more narrowly give them the relief they seek.

Allowing the program members to obtain a vote on the fund surplus—rather than issuing an order resolving the issue ourselves—would allow the members to decide what to do with that money without court involvement and without plaintiffs' lawyers taking home a portion of the members' refund. As to other relief the members might seek under trust law, the Arkansas courts are better equipped to handle questions about a nonprofit corporation's duties as trustee to beneficiaries who are also the corporation's members under Arkansas law.

Dismissal under Rule 19 hardly even prejudices the interests of absent program members who want a refund. Without a refund, all program members will still get credit toward subsequent years' program fees in the same amount as they would receive from a refund. The difference is that the members would have to give plaintiffs' counsel a slice of their refund if they obtained a *court-ordered* refund. Moreover, given that the named plaintiffs could not proceed with a class action, the absent members who want a refund should not be parties. So, they would not be bound

22-11128 TJOFLAT, J., Concurring and Dissenting in part        13

by a judgment and could bring the same claim for the same relief, leading to duplicative litigation. And, again, if most program members want a refund, they can vote for one. On the whole, equity strongly favors dismissal.

The bottom line: the plaintiffs' complaint should have been dismissed under Rule 19 from the outset. If the named plaintiffs in this case had prevailed, they would have changed a timeshare exchange program that its thousands of members had invested in. But the members who were satisfied with the program were not properly joined as defendants so that they could defend their interests in retaining what they signed up for.

Because joining those members was not feasible, and the District Court could not proceed in equity and good conscience without them, the District Court should have dismissed the case. Respectfully, I therefore dissent from that portion of the Majority Opinion.